Norman C. Ryp, J.
Current national crises plug into currently charged and electrifying legal issues.
Does a State administrative agency’s (New York State Public Service Commission) accelerated electrical rate change procedures connected with the 1973-1974 "energy crisis” justify a landlord’s noncompliance, under the doctrine of impossibility or impracticality of performance, with prior demand requirements for electricity "fixed rent” raises under a commercial lease?
FACTS
This was a key issue, among others, in this nonjury, commercial nonpayment summary proceeding. Petitioner landlord ("landlord”) charged, in his amended petition, from a shocked respondent-tenant ("tenant”) a final judgment of possession; $242,363.72 in "fixed rent” under article 16, including article 16.04 specifically, of subject lease ("PX-1”), plus 1½% per month late charges from June 1, 1974 on his first cause of action. A second cause of action, upon stipulation of the parties confirmed by order of this court, dated March 17, 1975, for $284,433.98, as additional rent, for "Extra Work,” under *264 part IV of subject lease, was dismissed, without prejudice, pending arbitration proceedings, under article 31 of subject lease, but subject to this court retaining jurisdiction to enter a judgment upon any arbitration award made therein.
The essential facts are basically uncontroverted. Landlord is the owner of real property located at 9 West 57th Street in the County, City and State of New York, including the portion thereof leased by tenant and used exclusively for business and commercial purposes. Furthermore, by lease, dated July 24, 1970 ("PX-1” or "subject lease”), as thereafter amended or supplemented, landlord leased to tenant, a New York corporation, at a specified "fixed rent” reserved (see arts 1.04, 16.05-PX-1), for 25 years after "Commencement Date” (art 1.03-PX-1) approximately 621,450 to 676,250 square feet of rentable area on 25 (12-36th) floors and part of the second basement within said real property ("Demised Premises”) and tenant is presently in possession thereof. Thereafter, a first supplementary agreement, dated February 1, 1971 and a second supplementary agreement, dated March 1, 1972, to subject lease were each duly executed and delivered by the parties herein, without any reference to article 16 — electricity—in subject lease. Tenant allegedly took possession of the demised premises on October 1, 1972. There is a dispute as to the effective actual "Commencement Date,” with landlord claiming March 4, 1972 and tenant claiming September 27, 1972. This issue is presently in arbitration under article 31 of subject lease.
For the period from October 1, 1972 through November 30, 1974, landlord included in the "fixed rent”, billed for electrical services in the demised premises the total amount of $543,280.33 less payments of $301,916.61, leaving a claimed balance of $242,363.72 (including $42,491.84 for electrical rate increases of January 10 and September 22, 1973 and March 8, 1974 and the balance of $199,871.88 for approximately 29 fuel adjustment increases between the effective date period from October 1, 1972 and December 12, 1974 — PX-39), plus $35,241.99 as \Vi% claimed delinquency charges from June 1 through November 30, 1974 (and to date of judgment), all totaling $276,605.71, claimed due and payable but which tenant failed and refused to pay.
Tenant’s amended answer responding to the remaining first cause of action, interposed various denials and affirmative defenses of: ñrst: failure to state a claim upon which relief can be granted; and, second; subject to existing formal arbitration *265 commenced by landlord. This latter second affirmative defense, upon tenant’s motion to compel arbitration (CPLR art 75) and stay this summary proceeding, was previously denied, as a matter of law, by order of Judge Richard W. Wallach, dated January 30, 1975.
Pursuant to subject lease, landlord agreed to furnish electricity in the demised premises to tenant, which was to reimburse landlord on a "so-called rent inclusion basis” (art 16.01 - PX-1) in addition to the annual "fixed rent” per square foot rentable area of $13.95, including 45^ for electricity (arts 1.04[a], 16.05-PX-l) that contemplated "building standard electrical installations in the Demised Premises to be erected”. (See p 1 and par '1.’ — Electricity Letter, dated July 24, 1970 ["Elec.Ltr.”], executed and delivered concurrently with subject lease.)
Under subject lease, such tenant reimbursement "shall fairly reflect” in an annual amount in case of increase in rates or any charges or taxes payable in connection with landlord’s annual cost of furnishing electricity to tenant, effective from the date of landlord’s written demand, whether or not a supplementary agreement is executed following determination by an independent electrical engineer or consultant selected by landlord (New York Supply and Inspection Co., Inc., "NYSIC” herein, selected Dec 1, 1972-Nov 30, 1975 — PX-2) and paid equally by landlord and tenant. (See arts 16.03 and 32.01 — PX-1.)
Under paragraph '4.’ — Elec.Ltr., purporting to cover the applicable Con Edison electrical service classification ("SC”) rate, states: "All valuations of the electrical service to the Demised Premises made pursuant to Article 16 of the Lease (including the valuation herein provided to be made as at the Commencement Date), shall be based upon the then current public utility rates for wholesale purchase of your requirements, that is as if you were purchasing directly from a public utility the electricity required by you in a building consisting solely of the Demised Premises and utilizing only the electricity to be utilized in the Demised Premises.”
Under subject lease, landlord also reserved the right to voluntarily discontinue furnishing electricity to tenant on not less than 60 days written notice to tenant, with the lease to continue in full force and effect, except the above annual "fixed rent” was to be reduced by 45^ per square foot rentable area, originally allocated for electricity, and tenant was to *266 obtain electricity from the public utility serving subject real property ("Con Edison”). (See arts 16.05, 32.01 — PX-1.)
The record indicates that an electrical usage and capacity issue (art 16.02-PX-l) was fully resolved between the parties on September 11, 1974. (PX-10.)
ISSUES
The remaining issues are:
A. What is the applicable electricity utility rate intended by the parties under subject lease, SC-4 or SC-9?
B. What were the effective dates of various electricity utility rate and fuel adjustment increases, as of PSC orders or landlord’s written demands?
(1) If as of landlord’s written demands, what constituted a written demand?
(2) Was the nature and quality required of such written demand effected by the so-called "energy crisis” and PSC acceleration of increases?
C. Trial Motions.
(1) By tenant to strike the Geller testimony as to alleged February 27, 1974 conversations claiming tenant’s waiver or estoppel of any future demands under art 16.03 of subject lease.
(2) By tenant to admit into evidence various ElectriNews Bulletins (RX - I) covering the period from October 4, 1972 through March 8, 1974.
APPLICABLE LAW
In determining the above issues, under the general principle of reasonable interpretation of the intention of the parties to subject lease in due consideration of all the relevant facts and circumstances therein, the court has reviewed and is guided by the following applicable leading cases and authorities, including, but not limited to: Farrell Lines v City of New York (30 NY2d 76, 83); Rodololitz v Neptune Paper Prods. Co. (22 NY2d 383, 386-387); Rentways v O’Neill Milk & Cream Co. (308 NY 342, 348); Black v General Wiper Supply Co. (305 NY 386, 390); 455 Seventh Ave. v Hussey Realty Corp. (295 NY 166, 172); Wendell Foundation v Moredall Realty Corp. (282 NY 239); Columbia Spa v Star Co. (216 App Div 218, 221); Parkwood Realty Co. v Marcano (77 Misc 2d 690); section 236 of the Restatement of Contracts.
*267 A. UTILITY RATE
At the time subject lease was prepared and executed, there was only one public utility electricity rate (SC-2) for the demised premises, which was both a wholesale rate and the rate at which tenant could have directly purchased electricity for its requirements.
Thereafter, the electrical utility rate structure was changed to create the following: (1) a new SC-4, which is purportedly the wholesale rate for redistribution and the rate at which landlord purchases electricity; and (2) a new SC-9 general charge, which purportedly was not available to landlord and which cannot be used for redistribution unless tenant sublets 10% or less of its space. (PX-18.)
Landlord presented an expert witness, NYSIC’s executive vice president, Richard H. Lorson, who testified and was cross-examined extensively by tenant during the trial.
Tenant’s contention is that the SC-9 rate should be used since both SC-4 and SC-9 permit a Con Ed customer to redistribute electricity to tenants on a rent inclusion basis under certain circumstances. However, tenant nowhere defines the specific applicable circumstances qualifying tenant for use of the SC-9 rate, which, according to landlord’s expert witness, is inapplicable to tenant or subject demised premises requiring an SC-4 rate.
In addition, the record does not indicate that tenant comes within any of the "Special Provisions” required for SC-9 eligibility (see PX-18C, p 3-4) so the court finds the applicable electrical utility rate for demised premises is SC-4, the only wholesale rate paid by landlord since September, 1970.
B. EFFECTIVE DATES FOR ELECTRICITY INCREASES
Article 16.03 of subject lease appears to be most relevant upon this issue and reads as follows: "If at any time or times after the date of this lease, the rates at which Landlord purchases electricity from the public utility serving the Building, or any charges incurred or taxes payable by Landlord in connection therewith, shall be increased or decreased, as the case may be, upon demand of either party, in an annual amount which shall fairly reflect the estimated increase or decrease in the annual cost to Landlord of furnishing electricity to Tenant under the provisions of this Article. If, within 10 days after any such demand, Landlord and Tenant shall fail to agree upon the amount of such increase or decrease in fixed rent, such amount shall be determined by an independent *268 electrical engineer or consultant selected by Landlord and paid equally by both parties. Following any such agreement or determination, the parties shall execute an agreement supplementary to this lease to reflect such increase or decrease in the amount of the fixed rent stated in Section 16.05 effective from the date of the above-mentioned demand; but such adjustments shall be effective from such date whether or not such a supplementary agreement is executed(Emphasis added.)
Thus, the text and clear meaning of article 16.03 — PX-1 require a demand in writing (art 32.01 — PX-1) to trigger any electricity (rate or fuel adjustment) rent increase, effective from the date of such demand, whether or not a lease supplementary agreement is executed, with such demand made by direct, not constructive (New York Times Con Ed ads — PX-29 and 30) notice.
When were the required demands made under article 16.03 of subject lease?
Landlord claims he duly demanded rate "fixed rent” increases for each of the PSC rate increases, effective January 10 and September 22, 1973 and March 8, 1974, by respective letters, dated June 10, 1973 (PX-3), October 5, 1973 (PX-4) and October 1, 1974 (PX-14) or waived. Tenant contends the effective dates of the first two rate increases were the letter (PX-3, 4), as distinct from the PSC order, dates with the third one PX-14 or never made.
Applying the principles set forth in Farrell Lines and Rodolowitz and other citations above to article 16.03 — PX-1, the court finds that the effective dates for the PSC January 10, September 22, 1973 and March electrical rate increases are June 20, October 5, 1973 and October 1, 1974, respectively. Based upon the record in this case and not necessarily governing future written demands under article 16.03 — PX-1, this court holds that such written demand requirements, considering circumstances of PSC bureaucratic delay and the "energy crisis,” do not compel landlord under subject factual record to give tenant a mathematically complete and precise amount of the electrical rate increase to fairly and reasonably satisfy article 16.03 — PX-1 herein.
Such principles of law and reason equally apply to subject electrical fuel adjustment increases. During the period October 1, 1972 through December 12, 1974 (26 months including the 1973-1974 "energy crisis”), there were 29, as distinct from *269 prior quarterly (PX-27), fuel adjustment increases (PX-39). Landlord claims that since these very accelerated fuel adjustment increases are not publicly announced by PSC and Con Edison until after the applicable period and then landlord still does not know the exact amount of the fuel adjustment increase until landlord receives his subsequent electricity bill, it would have been totally impracticable, if not inequitable and impossible, for landlord to make a formal, written and itemized demand upon tenant under article 16.03 of subject lease with respect to each of the more than monthly fuel adjustment increases (29 during 24 months). Tenant relies upon the literal terms of article 16.03 — PX-1, claiming such practically operational with proper organization and dilligence and that hardship or impracticality do not excuse nonperformance of a contract, citing Cameron-Hawn Realty Co. v City of Albany (207 NY 377, 381-382).
It is quite true that the very essence of a bilateral contract, whose rules governing requisites and validity apply to leases (33 NY Jur, Landlord and Tenant, § 17) is mutuality of obligations, which must be regarded seriously and upheld steadfastly, despite adverse circumstances, to remain a viable mechanism for transactional understandings and reliability especially in the commercial field. (Blaschka, Inc. v Frazer; 32 AD2d 774, affd 30 NY2d 645.) But rules of construction of contracts require, whenever possible, a "fair and reasonable interpretation.” (See Farrell v City of New York, supra, p 83 [involving a pier lease interpretation] and authorities cited therein, especially in view of landlord’s right to discontinue furnishing electricity upon 60 days’ notice [art 16.05].)
The court finds that under the facts and circumstances herein a fair and reasonable interpretation does not require a formal, itemized demand, under article 16.03 of subject lease, for electrical fuel adjustment and that the written letter notices, including electrical evaluation reports satisfied the lease obligations thereunder. (See PX-3, dated June 20, 1973; PX-4, dated Oct 5, 1973; PX-9, dated March 28, 1974; PX-10, dated June 4, 1974; PX-14, dated Oct 1, 1974.) Such is based upon the facts, circumstances and record in this case and does not necessarily govern future written demands under article 16.03 of subject lease.
Landlord further contends that at a February 27, 1974 meeting in tenant’s office, attended by the parties’ counsel, electrical consultants and representatives, including Arthur *270 Geller, vice president, Cushman & Wakefield, managing agents, for landlord, Robert McMillan and A1 Wakefield for tenant (subject to tenant’s trial motion to strike as incompetent) to discuss and review all outstanding electricity rent issues, landlord’s Arthur Geller testified (subject to tenant’s trial motions to strike as incompetent upon which this court reserved decision) that tenant’s lease negotiating counsel (Robert M. Feely) told Mr. Géller that from then (Feb 2, 1974) on no future notices or demands, for electricity (rate or fuel adjustment) increases from landlord to tenant, (under arts 16.03, 32.01 — PX-1) would be necessary. In addition, landlord claims that in a subsequent March 26, 1974 telephone conversation, tenant’s same negotiating counsel (Robert M. Feely) indicated to landlord’s lease negotiating counsel (Paul A. Landsman) there was no need to give formal demand as to the March 8, 1974 electrical rate and the monthly fuel adjustment increases. Accordingly, landlord concludes that in reliance upon such statements, landlord’s said counsel advised landlord thereafter formal demand for electrical fixed rent increases (art 16.03 — PX-1) was not necessary and that tenant is equitably estopped” or has "waived” such demand under subject lease.
Tenant, to the contrary, maintains that its said counsel did not agree to anything, but if all other electricity issues were resolved said counsel would "recommend to tenant, his client, that electricity rent escalation increases be effective from the date of the Con Edison increase rather from landlord’s demand.” Accordingly, tenant moved to strike such Geller testimony as incompetent, in violation of the parol evidence rule and in the context of settlement or compromise offers.
Assuming, without admitting, the competence of said Geller testimony, landlord’s contentions of equitable estoppel or waiver are without merit. Waiver is simply a voluntary relinquishment of a right with knowledge of all the facts; it is predicated upon intent. (21 NY Jur, Estoppel, § 16.) Equitable estoppel is a doctrine applied with great caution to realty. (Huggins v Castle Estates. 36 NY2d 427.) An attorney does not have the authority to bind his client by any act which amounts to a surrender or waiver in whole or in part of any substantial right of the client or substantially jeopardize his interests in any way. (3 NY Jur, Attorney and Client, § 22; see Matter of Goyette, 195 Misc 562.) In addition, an attorney has no implied authority to settle a case without the consent of his *271 client so that a settlement agreement negotiated by an attorney, without the client’s consent, is not binding upon the client. (See Stein v Mostoff, 34 AD2d 655.)
Finally, landlord asserts the right to charge tenant with a late charge of \l/i% per month for any outstanding amount due from tenant to landlord for electricity. This claim is based upon PSC’s authorization to Con Edison, effective May 16, 1974, which notified its customers, including landlord thereof. The relevant part of article 16.03 of subject lease states as follows: "If at any time or times after the date of this lease * * * any charges incurred or taxes payable by Landlord in connection therewith [N.B.-purchase of electricity] shall be increased * * * the fixed rent reserved hereunder shall be increased” (emphasis added). This is clearly an indemnity or reimbursement type of clause and since landlord’s vice president testified landlord did not incur any late charges, landlord is precluded herein.
C. TRIAL MOTIONS BY TENANT.

(1) Motion to strike Geller testimony on February 27, 1974 meeting.

Since this court has above denied landlord’s claim of "equitable estoppel” or "waiver”, this motion is now moot.

(2) Motion to admit various ElectriNews Bulletins (RX-I) covering October 4, 1972 to March 8, 1974.

The court has reviewed each of the subject 21 ElectriNews Bulletins, all of which refer to the apparent certainty of increased electricity charges (rate and fuel adjustment) but only three are factually specific (see vol II, Nos. 3, dated Feb 1, 1973; 5, Feb 27, 1973; 12, dated Sept 21, 1973), competent or relevant. The late, revered Harvard Law Professor, James Angelí MacLachlan, daily inspired his law students with the words, among other wisdom, "Nothing is as certain as death. Nothing is as uncertain as the hour of death.” To which may be added, in the 1970’s, "Nothing is as certain as taxes. Nothing is as uncertain as the hour and amount of taxes.” Accordingly, tenant’s subject motion is denied except as to volume II, Nos. 3, 5 and 12, which are admitted as competent, subject to weight with all other evidence.
CONCLUSION.
The foregoing constitutes the decision of this court, adopting those parties’ proposed findings of fact and conclusions of law consistent therewith and rejecting all others. Settle proposed *272 final order and judgment, including a 30-day stay of execution and in the amount(s) provided in PX-38, column VI-SC-4. The court commends both parties’ trial counsel and staff for high professional competence and courtesy during this lengthy trial, providing the court with extensive briefs, daily trial transcripts of over 1,200 pages and copies of the 45 trial exhibits, the originals of which may be picked up from the clerk of the court.